**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| American Municipal Power, Inc., *et al.*, | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Nos. 20-1372, 20-1373, 20-1374, |
| | ) 21-1117 |
| Federal Energy Regulatory Commission, | ) (consolidated) |
| Respondent. | ) |

**MOTION TO GOVERN**
**OF RESPONDENT**
**FEDERAL ENERGY REGULATORY COMMISSION**

On November 7, 2022, this Court "ORDERED that these consolidated cases remain in abeyance pending further order of the court.  Respondent [Federal Energy Regulatory Commission] is directed to file status reports at 120-day intervals beginning March 7, 2023."  The Court further ordered that "[t]he parties are directed to file motions to govern further proceedings within 30 days of the disposition by the United States Court of Appeals for the Sixth Circuit of Electric Power Supply Association v. FERC ["EPSA"], No. 22-3176, et al."

On December 22, 2021, the Commission issued an "Order on Voluntary Remand" in this matter.  *See PJM Interconnection, L.L.C.*, 177 FERC ¶ 61,209 ("Remand Order").  The Remand Order affirmed in part and reversed in part the prior-issued orders originally challenged in the above-captioned consolidated petitions for review.  *Id*. Ordering P (A).  The Remand Order directed PJM to file revisions to its tariff within 60 days to comply with the Commission's latest

determinations. *Id*. Ordering P (B).  It also ordered PJM to submit a compliance filing with a revised schedule for the Base Residual Auction for the 2023/2024 delivery year and subsequent such auctions within 30 days. *Id*. Ordering P (C).

After receiving timely applications for rehearing of the Remand Order, the Commission issued an order addressing requests for rehearing in *PJM Interconnection, L.L.C.*, 180 FERC ¶ 61,051 (July 28, 2022) ("Rehearing Order"). Parties then sought judicial review of the Remand Order and Rehearing Order in the Sixth Circuit.  Oral argument in *EPSA* was held on October 19, 2023 in Cincinnati, Ohio, and the court issued its decision on December 21, 2023, in which it vacated in part the Rehearing Order and remanded the matter to the Commission for further proceedings (opinion attached).

The time periods for a party to petition for rehearing of *EPSA* or to file a petition for a writ of certiorari have not yet expired.  *See* U.S. Sup. Ct. R. 13; Fed. R. App. P. 40; 6th Cir. R. 35(c).  Accordingly, continued abeyance of the above-captioned petitions is appropriate.

The Commission respectfully requests that the Court maintain abeyance of the above-captioned petitions (Nos. 20-1372, *et al.*) until the later of the Sixth Circuit's final disposition of any petition for rehearing, or the U.S. Supreme Court's final disposition of any petition for a writ of certiorari.  The parties would file motions to govern future proceedings within 21 days of the expiration of abeyance.

Respectfully submitted,

Robert H. Solomon
Solicitor

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory
    Commission
Washington, D.C. 20426
Tel.: (202) 502-8101
Email: jared.fish@ferc.gov

January 22, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1) and Circuit Rule 32(e), I certify that this motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this motion contains 407 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this motion has been prepared in Times New Roman 14-point font using Microsoft Word 365.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney

Federal Energy Regulatory
  Commission
Washington, DC 20426
Office:  (202) 502-8101
Fax:  (202) 273-0901
Jared.fish@ferc.gov

January 22, 2024

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0274p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

ELECTRIC POWER SUPPLY ASSOCIATION (22-3176/3666);
PJM POWER PROVIDERS GROUP (22-3794/3796),

> *Petitioners*,

PJM INTERCONNECTION, L.L.C.,

> *Intervenor-Petitioner* (22-3794/3796),

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

> *Respondent*,

AMERICAN MUNICIPAL POWER, INC., OLD DOMINION ELECTRIC COOPERATIVE, PJM INDUSTRIAL CUSTOMER COALITION, PENNSYLVANIA PUBLIC UTILITY COMMISSION, MONITORING ANALYTICS LLC, and PJM INTERCONNECTION, L.L.C. (22-3176/3666); MARYLAND OFFICE OF PEOPLE'S COUNSEL, DELAWARE DIVISION OF THE PUBLIC ADVOCATE, and NEW JERSEY DIVISION OF RATE COUNSEL (22-3176/3666/3794/3796),

> *Intervenors*.

Nos. 22-3176 /3666 /3794 /3796

---

On Petitions for Review of Orders of the Federal Energy Regulatory Commission.
Nos. EL 19-58-006; ER 19-1486-003.

Argued:  October 19, 2023

Decided and Filed:  December 21, 2023

Before:  SUTTON, Chief Judge; CLAY and LARSEN, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Paul W. Hughes, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Petitioners.  Jared B. Fish, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent.  Jason T. Gray, DUNCAN & ALLEN LLP, Washington, D.C., for

Nos. 22-3176/3666/         *Electric Power Supply Ass'n, et al. v. FERC*              Page 2
3794/3796

Intervenors.  **ON BRIEF:**  Paul W. Hughes, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Petitioners.  Jared B. Fish, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Respondent.  Jason T. Gray, DUNCAN & ALLEN LLP, Washington, D.C., Gerit F. Hull, AMERICAN MUNICIPAL POWER, INC., Columbus, Ohio, Scott H. Strauss, Amber L. Martin Stone, SPIEGEL & MCDIARMID LLP, Washington, D.C., Robert A. Weishaar, Jr., MCNEES WALLACE & NURICK LLC, Washington, D.C., Kenneth R. Stark, MCNEES WALLACE & NURICK LLC, Harrisburg, Pennsylvania, Jeffrey W. Mayes, MONITORING ANALYTICS, LLC, Eagleville, Pennsylvania, Regina A. Iorii, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, Adrienne E. Clair, Jecoliah R. Williams, THOMPSON COBURN LLP, Washington, D.C., Christian A. McDewell,  Kriss E. Brown, PENNSYLVANIA PUBLIC UTILITY, Harrisburg, Pennsylvania, for Intervenors.

SUTTON, C.J., delivered the opinion of the court in which LARSEN, J., joined in full and CLAY, J., joined in part.  CLAY, J. (pp. 15–25), delivered a separate opinion dissenting in part.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.  Before us are two questions:  Did the Chairman of the Federal Energy Regulatory Commission exceed his authority in moving for a remand of a ratemaking challenge without the support of any other members of the Commission?  If not, did the Commission's underlying ratemaking decisions sink to the level of arbitrary and capricious agency action?  As to the first question, the Commissioner exceeded his administrative authority. We accordingly remand the matter to the agency in the first instance to determine what, if anything, can or should be done about this ultra vires action.  Once the agency has had the opportunity to resolve that point, any interested party may renew the petition for review of the second question.

I.

Americans have come to expect their electricity and other forms of power to be available at the flick of a switch.  But technology has not yet provided a cost-efficient way to store electricity.  Utilities as a result must have the capacity to handle peak demand when consumers need it.  Fed. Energy Regul. Comm'n, Staff Report, *Energy Primer: A Handbook for Energy Market Basics* 36–37, 46, 52 (Apr. 2020).  Rather than make an expensive upfront investment in

generator capacity that would sit unused most of the time, utilities typically agree to buy and sell excess reserves to their neighbors as supply and demand require.  *Id.* at 36–37.  A utility normally purchases power from its neighbors when the price falls under its own cost of generating an additional unit of electricity, and it sells power when it can obtain a price above its own costs.  *Id.* at 37.

The market for electricity works only as well as power flows between generators and purchasers.  Since the late 1990s, the government has required the utilities that own power plants to permit open access to their transmission lines.  *Id.* at 39.  When a power plant generates electricity, it flows across the entire transmission grid, mixing with power from other plants on its way to the purchaser.  *Id.* at 54.  Overseeing this transmission system for much of the country are "independent system operators" and "regional transmission organizations."  *Id.* at 39, 61.  These entities forecast the wholesale demand for electricity and determine which generators and load-serving entities on their grid are in the best position to supply it.  *Id.* at 63–64.  They also maintain generation reserves by purchasing capacity not currently scheduled for operation and arranging for it to enter operation if power production unexpectedly falls.  *Id.*

The oldest of these organizations and the largest measured by all-time peak load is PJM Interconnection, L.L.C.  *Id.* at 62.  It started in 1927 as a reserves-pooling agreement between three utilities and expanded in 1956 to become the Pennsylvania-New Jersey-Maryland Interconnection.  *Id.* at 38, 85.  Hence PJM's current name.  Today, the utility operates part or all of the transmission lines in 13 states in the mid-Atlantic and Midwest as well as the District of Columbia.  *Id.* at 85.  Governing PJM are a Board and a "Members Committee" representing five classes of stakeholders:  power generators, transmission owners, electric distributors, power marketers, and large consumers.  *Id.* at 86.  Each day, PJM calculates the price of power at each location on the grid in advance and then adjusts the prices in real time.  *Id.* at 87–88.

PJM also obtains reserves to maintain the reliability of the transmission system.  PJM maintains "Step 1" reserves sufficient to replace its largest online generator within 15 minutes and "Step 2" reserves to address other supply shortfalls or fluctuations.  *Id.* at 88; JA0981–82, ¶¶4–5.  PJM acquires these reserves through auctions at which it offers to pay a price up to a

"reserve penalty factor" approved by the Commission.   JA0983–84, ¶7; *see Energy Primer*, *supra*, at 88–89.   As its name suggests, the reserve penalty factor functions as a price cap and represents the maximum price the agency is willing to allow the market to set for a quantity of reserves.   Put another (slightly more accessible) way, it's the highest cost that PJM will incur to redispatch its system to procure an additional megawatt of reserves.   In 2012, the Commission approved a price cap for PJM's Step 1 reserves of $850 per megawatt hour, and in subsequent years the next 190 megawatts of Step 2 faced a cap of $300 per megawatt hour.   Beyond that point, PJM usually pays nothing for additional reserves.

Over time, price caps create regulatory friction for businesses caught between fixed prices and ongoing market developments.   *See generally* Samuel Evan Milner, *Robbing Peter to Pay Paul: Power, Profits, and Productivity in Modern America* 26–36, 178–81, 197–203 (2021) (providing examples of price controls that collapsed in the face of economic contingencies and dynamic markets).   When PJM adopted its price caps for reserves, the maximum price at which energy suppliers could offer power to the market was $1,000 per megawatt hour.   But in 2016, regulators raised the cap to $2,000 per megawatt hour.   That change made it more difficult for PJM to obtain adequate reserves (by increasing the opportunity cost to forego market sales).   This pricing schedule also did not place any value on additional reserves after the first 190 megawatts on top of Step 1, a threshold that PJM believed had become obsolete in the face of changing power market conditions.   Between 2015 and 2017, for instance, PJM calculated that fluctuations in wind power alone would consume over 80% of that reserve.   In practice, PJM continued to obtain most of its necessary reserves and often paid an auction price of $0 per megawatt hour for reserves because power plants already operating could supply idle capacity at no cost.   But PJM believed that it had achieved this result only by "biasing" generator scheduling and undertaking out-of-market support, workarounds that it saw as evidence that this pricing system was faltering and would eventually lead to shortages.   JA0039–40, JA0683.

Because PJM operates in the interstate market for transmitting and selling electricity, it could not modify its reserve price caps without approval from the Commission.   *See* 16 U.S.C. § 824.   Regional transmission organizations ordinarily seek approval for new rates under 16 U.S.C. § 824d, which requires a showing that the proposed rates are just and reasonable.   But

Nos. 22-3176/3666/          *Electric Power Supply Ass'n, et al. v. FERC*          Page 5
3794/3796

PJM's Operating Agreement allowed it to use that authority only if a weighted majority of its Members Committee approved it, and the Board failed to obtain the necessary stakeholder support.

In March 2019, the PJM Board instead filed this request under 16 U.S.C. § 824e(a), which required PJM to prove both that its existing rates were unjust and unreasonable and that its proposed replacements would cure the defects. PJM requested two major changes from the Commission. It asked the Commission to raise the reserve price cap for Step 1 to $2000 per megawatt hour, reflecting the costs that it believed it would have to pay to obtain reserves. And it asked the Commission to replace the flat $300 per megawatt hour cap after Step 1 with a downward sloping price schedule that would more accurately account for the value of additional reserves.

In May 2020, the Commission agreed with PJM that the existing price cap for reserves and stepwise demand curve were unjust and unreasonable. It found that PJM's reserve market "systematically fail[ed] to acquire within-market" reserves needed to operate its system reliably for three reasons. JA0687. First, PJM operators frequently distort demand upward in market forecast software. This persistent bias, the Commission reasoned, likely shows that the need for reserves "far exceed[s]" the mandatory requirements, suggesting a flaw in the existing design. JA0688. Second, PJM's minimum requirements are significantly lower as a percentage of peak load compared to other regional transmission organizations, but PJM faces higher operational uncertainties. Third, operators often acquire additional reserves at costs above the price caps for reserves through out-of-market uplift, meaning the existing caps do not reflect the true price of reserves. This evidence, the Commission explained, demonstrates a reserve market design that fails to acquire necessary reserves within the market and fails to "send appropriate price signals for efficient resource investment." JA0687. The new price cap and demand curve were set to go into effect on May 1, 2022. Commissioner Richard Glick dissented, arguing that this evidence did not indicate a flawed market structure and that PJM "failed to satisfy its burden of proof." JA0801.

Nos. 22-3176/3666/          *Electric Power Supply Ass'n, et al. v. FERC*          Page 6
3794/3796

Within a month, several interested entities requested a rehearing of the Commission's decision. In November 2020, the Commission denied that request but issued a new order, confirming its initial decision. Several parties sought review of the orders in the U.S. Court of Appeals for the District of Columbia Circuit. In the meantime, the agency's composition shifted. Commissioner Glick became Chairman in January 2021, and two new Commissioners replaced outgoing members: Commissioner Allison Clements joined in December 2020, and Commissioner Mark C. Christie joined in January 2021.

On August 13, 2021, the Commission sought a voluntary remand from the D.C. Circuit to "reconsider[]" its prior decisions. JA0885. The D.C. Circuit granted the unopposed motion ten days later and remanded the consolidated cases to the Commission. Unknown to PJM or, we presume, the court at the time, Chairman Glick had directed the Solicitor's Office to seek the remand without notifying the other Commissioners and without holding a vote to consider the action.

On remand, the Commission pivoted. It now found PJM's evidence insufficient to show that the price caps for reserves and stepwise demand curve were unjust and unreasonable. While acknowledging operator distortions, out-of-market uplift, and PJM's operational uncertainties, the agency found this evidence insufficient to show a problem with the reserve market. Operators, for example, distort demand upwards but also downwards (and sometimes not at all), suggesting that any bias may not correlate with reserve shortages. Out-of-market uplift does occur, the Commission likewise acknowledged, but it can stem from benign market forces unrelated to a shortage of reserves, such as settlements for mismatched prices. The Commission in the end decided that PJM had not provided evidence of a genuine, non-hypothetical risk of shortages. The Commission reimposed the prior price cap of $850 per megawatt hour for Step 1 reserves and the stepwise, vertical demand curve for reserves beyond Step 1. James Danly, the remaining Commissioner (as the fifth seat was not filled), filed a separate dissent in which he disclosed that the Chairman had directed the Commission's Solicitor to seek remand without first informing the other Commissioners.

Nos. 22-3176/3666/        *Electric Power Supply Ass'n, et al. v. FERC*        Page 7
3794/3796

PJM and others sought rehearing before the Commission, citing this newly disclosed procedural irregularity and challenging the substance of the agency's shift in views. The Commission rejected the request but issued a modified order, reaching the same result, providing additional explanations, and (among other things) reasoning that Chairman Glick had the unilateral authority to make the remand motion. This petition for review followed. 16 U.S.C. § 825l(b).

II.

Petitioners Electric Power Supply Association and PJM Power Providers Group (collectively, PJM) argue that the Chairman exceeded his legal authority when he requested a remand in the name of the Commission on his own. We agree.

Look first at the statute to see why. The Commission consists of five Commissioners appointed by the President with the advice and consent of the Senate, one of whom the President designates as Chairman. 42 U.S.C. § 7171(b). The Commission may "transact[]" "business" only in the presence of at least three Commissioners. *Id.* § 7171(e). The majority vote of that quorum carries the day on all agency "[a]ctions." *Id.*

This language establishes the default expectation that a quorum majority must decide the Commission's policy and dealings with the outside world. "Business" encompasses the agency's "normal, logical or inevitable" activity. *Business, Webster's Third New International Dictionary of the English Language* 302 (1993). In a formal sense, the Commission's business refers to matters that it deliberates over "for its consideration and action." *Business*, *Black's Law Dictionary* (11th ed. 2019). And an action refers to the agency's "act or decision" or its "deed" or "thing done." *Action, Webster's Third*, *supra*, at 26.

Other statutory language reinforces the idea that Congress requires a quorum majority to approve agency actions of this sort. Congress has charged the Commission with the power "to perform any and all acts" necessary to "carry out" its duties. 16 U.S.C. § 825h. It may "exercise any power" available to its predecessor agency that "the Commission determines" necessary to a "function" within its "jurisdiction." 42 U.S.C. § 7172(2)(A) (incorporating 16 U.S.C. §§ 825e–825h). The Commission has responsibility for the "establishment, review, and enforcement of

rates and charges" for electricity transmission and sales. *Id.* § 7172(a)(1)(B). And it may receive and evaluate complaints from utilities such as PJM that rates are not just or reasonable. *See* 16 U.S.C. § 825e.

Each step of consequence in the life of a pricing order qualifies as an action of the agency that a quorum majority must approve. When the agency issues "orders," that clearly qualifies as "actions of the Commission." 18 C.F.R. § 375.102(b). The Commission thus may issue such an order only if a quorum majority approves it. *See Advanced Energy United, Inc. v. FERC*, 82 F.4th 1095, 1101 (D.C. Cir. 2023). No surprise, if four members split evenly, no action results from the deadlocked quorum. *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170 (D.C. Cir. 2016).

The same requirements apply when the agency modifies an existing order. "[T]he Commission" holds the power as a collective to "modify or set aside, in whole or part," an order while it retains the record. 16 U.S.C. § 825l(a); *cf. Allegheny Def. Project v. FERC*, 964 F.3d 1, 5 (D.C. Cir. 2020). Once the Commission has filed the record with the court of appeals, it no longer has the authority to take such an action. 16 U.S.C. § 825l(a). At that point, the agency may initiate a proceeding to issue a new order, *id.* § 824e(a), or it may request that the court remand the record to the Commission so that it may "reconsider, re-review, or modify the original agency decision." *Sierra Club v. EPA*, 60 F.4th 1008, 1021 (6th Cir. 2023) (quoting *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C. Cir. 2017) (Kavanaugh, J.)). Either way, the agency may act only when a quorum majority supports the decision. *See Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 182 (D.C. Cir. 2022) (noting that the Commission did not request voluntary remand in a case until it "regained a quorum").

Context reinforces this conclusion. When Congress has provided specific examples along with general phrases, we ordinarily assume that the specific sheds light on the general. *See Dubin v. United States*, 599 U.S. 110, 124–27 (2023). Congress has provided five examples of the Commission's operation that fall within the Chairman's responsibilities. Four of those pertain to personnel matters: appointing and employing hearing examiners; selecting and compensating personnel the Chairman deems necessary; supervising the Commission's

personnel except for Commissioners' personal staff; and employing experts and consultants. 42 U.S.C. § 7171(c). The Chairman in particular may appoint an "executive director," *id.*, a position with the delegated authority to waive agency fees and charges, 18 C.F.R. § 375.312, and who otherwise carries out or administers the agency's policies, *cf.* 5 U.S.C. § 8474(b)–(c); 10 U.S.C. § 2903(b)–(d); 15 U.S.C. § 4805(a)–(b). The fifth responsibility requires the Chairman to distribute business within the Commission and its staff. 42 U.S.C. § 7171(c). None of these personnel or ministerial tasks describes or for that matter even hints at a unilateral authority to undo a Commission order by moving a court to remand the order to the agency.

A separate statutory authorization for litigation authority cuts in the same direction. The Chairman may "designate[]" attorneys to represent the agency in civil litigation outside of the Supreme Court. *Id.* § 7171(i). This provision provides the Commission with increased independence from the President by permitting it to represent itself in court. *See Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 472 & n.194 (D.C. Cir. 1982); *cf.* 28 U.S.C. § 518(a). That independence would vanish if the Chairman, whom the President designates from among the Commissioners, also could control the Commission's litigation decisions by himself. *See* 42 U.S.C. § 7171(b). The statutes simply do not convey a better-to-ask-for-forgiveness-than-permission approach to the Chairman's authority over substantive matters.

These requirements make particular sense for multimember commissions. Quorum rules ensure that the actions of a collective body represent its whole, not its individual members. *See New Process Steel, L.P. v. Nat'l Lab. Rels. Bd.*, 560 U.S. 674, 683–84 (2010); *Fed. Trade Comm'n v. Flotill Prods., Inc.*, 389 U.S. 179, 183–84 (1967). So too for the requirement that the quorum must reach a majority viewpoint. *See New Process*, 560 U.S. at 684. Each of the five Commissioners may work independently of the others and hire and supervise their own personal staff, but none has the power to countermand an action of the agency. *See* 42 U.S.C. § 7171(b)–(c). Only authentic actions of the Commission itself count. *See id.* § 7171(g) (assigning the "powers authorized by the law" to "the Commission"); 18 C.F.R. § 375.102(b) (requiring authentication of all Commission orders and other actions). Just as we colloquially ascribe the issuance of a rule or order to an agency and not its commissioners, we also typically ascribe a voluntary remand to that body "so that it could reconsider its decision." *E.g.*, *Citizens Against*

*Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 414 (6th Cir. 2004).  Confirming the point, the agency concedes that the Chairman could not have sought a remand on his own—even after a majority of Commissioners opposed it.  *Cf.* Respondent's Br. 40.

The Chairman's request to the D.C. Circuit in this case bears out these expectations.  The notice stated that the agency "request[ed]" that the D.C. Circuit grant a voluntary remand and informed the parties that the "Commission" made this request.  JA0884–85.  Nowhere in that document did it indicate that a quorum majority had not approved the decision, removing any legal force it otherwise would have carried.  *See Pub. Citizen, Inc.*, 839 F.3d at 1171.  The D.C. Circuit in turn evaluated and granted the motion as if it had been the Commission's own.  All perspectives considered, the Chairman exceeded his authority by moving for a remand on his own.

The Commission opposes this conclusion on several grounds.  It starts with a procedural objection.  How, it says, can PJM now challenge the Chairman's authority to unilaterally file a motion for voluntary remand when it raised this issue for the first time many months after the motion was filed?  Courts ordinarily require litigants to raise objections to the agency or the court at the first relevant opportunity.  *See McCarthy v. Madigan*, 503 U.S. 140, 144–45 (1992) (administrative exhaustion); *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022) (forfeiture).  But when a party fails to raise an argument of which it was not reasonably aware, its failure to make a timely assertion of that right does not prevent it from doing so at the first reasonable opportunity.  *See United States v. Olano*, 507 U.S. 725, 733–34 (1993); *Bannister*, 49 F.4th at 1012 (reviewing standards to excuse forfeiture); *see also* 16 U.S.C. § 825l(b) (excusing failure to exhaust issues before the Commission when "there is reasonable ground for failure so to do").

The timing of PJM's discovery that the Chairman acted alone readily qualifies for this exception.  The remand motion stated that the "Commission" sought a voluntary remand and said nothing about the Chairman's unilateral action.  JA0884.  The Commission's traditional practice up until then had been to conduct a poll of the Commissioners before requesting a remand, and the Chairman never publicly announced that he had changed this policy before

filing the motion.  PJM could not reasonably have discovered that the other Commissioners remained unaware of this departure from tradition when they themselves had not received notice. As soon as PJM learned about this unilateral action by the Chairman, it raised this issue in its petition for rehearing and gave the agency a chance to consider it.  *See* 16 U.S.C. § 825l(b).  On this record, PJM did not "sandbag[]" the agency or "strategically sle[ep] on its rights."  *Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 677 (6th Cir. 2018).

What about the statutory limit on our jurisdiction to review only an "order issued by the Commission," 16 U.S.C. § 825l(b), not the D.C. Circuit's remand order?  It is true that the terms of the judicial-review statute do not authorize us to review the *motion* itself.  And, of course, we may not review the D.C. Circuit's order either.  But the Commission addressed the Chairman's authority to file the remand motion in its rehearing order and concluded that this step was within the Chairman's statutory powers.  The Commission determined that there was no legal defect in the process by which it reacquired jurisdiction from the D.C. Circuit.  We may, of course, review the Commission's order as it relates to this question of statutory interpretation.

Turning to the merits of PJM's argument, the Commission maintains that the remand request does not require a quorum majority.  Congress, it notes, has designated the Commission to be an agency under the Administrative Procedure Act, 42 U.S.C. § 7171(i), and it requires a majority vote only for agency "[a]ctions," *id.* § 7171(e).  Under the Administrative Procedure Act, it adds, "agency action" includes an agency's rule, order, license, sanction, relief, or their equivalents and says nothing about motions to remand.  5 U.S.C. § 551(13).

That reasoning might make sense if the Commission asked us to evaluate whether we could review the remand request under the Administrative Procedure Act.  But this challenge focuses on whether the Commission has the authority to seek remand without a quorum majority. Congress did not use the phrase "agency action" in delineating the Commission's authority.  *See* 16 U.S.C. § 825l(b); 42 U.S.C. § 7171(e).  The Commission may undertake other actions that do not fall under the definition of "agency action" but still count as "action" in ordinary English. *See, e.g.*, 16 U.S.C. § 824e(d) (power to investigate costs without setting rates); 42 U.S.C.

§ 7171(g) (power to hold hearings); *id.* § 7172(c) (power to consider proposals from the Secretary of Energy).

Switching gears, the Commission contends that Congress granted the Chairman authority to file a voluntary remand when it permitted him to act "on behalf of the Commission" for its "executive and administrative operation." *Id.* § 7171(c). The scope of that authority is narrower than the Commission claims. As shown, these terms apply only to policies that the agency has already asked the Chairman to undertake. That explains why the Commission correctly concedes that, because the Chairman must exercise his authority "on behalf of the Commission," *id.*, he could not direct the Commission's staff to advance a position "contrary" to Commission action adopted by majority vote, Respondent's Br. 40. And that shows why the Chairman could not unilaterally seek remand of an issued order any more than he could confess error in a brief to our court without the Commission's consent.

What of the possibility that the agency receives deference when it comes to interpretations of ambiguous statutes? *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). But the ambiguity inquiry comes at the end, not the beginning, of the interpretive process. *See id.* at 843 n.9; *Lechmere, Inc. v. Nat'l Lab. Rels. Bd.*, 502 U.S. 527, 536–37 (1992). The relevant statutes, when viewed in context and after consideration of the relevant canons, are not sufficiently ambiguous to implicate *Chevron.*

What of the risk that this interpretation of the statute will require courts to monitor every agency filing to ensure that a majority approved it? We see the point but think the statute implicates far fewer court filings than one might fear. Most agency filings and briefs will not require majority votes of multi-member agencies. *Cf.* 18 C.F.R. § 375.305 (delegating certain Commission filing duties to the Solicitor); *id.* § 375.309 (delegating certain investigative duties to General Counsel). But some substantive filings surely do. *See* 42 U.S.C. § 7172(a)(2) (permitting "the Commission" to determine when to exercise power in support of its jurisdiction). All can agree that the actual position of an agency—the order at issue—requires majority support. After that, substantive motions going to the enforceability of the order require actions of the Commission, not just the Chairman. *Compare* 16 U.S.C. § 825m(a), (c)

(permitting the Commission to use its discretion when suing and hiring attorneys to ensure compliance), *with* 18 C.F.R. § 375.311 (declining to delegate to the Director of the Office of Enforcement the Commission's power to initiate enforcement suits).  At a minimum, the Commission must support a decision about a motion to confess error, to reconsider an order, or to obtain a remand from a court to permit the agency to supplement or alter its decision—all matters about the enforceability or not of a pending order.

This brings us to the question of remedy.  We may invalidate an agency order that rests on legal error.  *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943).  The Commission considered the significance of the Chairman's ultra vires act when PJM raised it in its petition for rehearing.  The Commission concluded that the Chairman possessed the legal authority to request remand.  That conclusion was incorrect.  In denying rehearing, the Commission also gave no clear indication of how it would have responded to PJM's petition if it had recognized that error, preventing us from severing that legal mistake from the rest of the rehearing order.  *See North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984).

We accordingly exercise our statutory authority "to affirm, modify, or set aside [a Commission's] order in whole or in part" by vacating the part of the Commission's order claiming the Chairman had this unilateral authority and for now leaving the rest of the challenged orders in place.  16 U.S.C. § 825l(b).  We leave it to the Commission to decide in the first instance what, if anything, it could or would have done differently in response to this legal mistake.  After the Commission resolves that point, any interested party may renew a petition to challenge that decision and to challenge any existing ratemaking orders on the grounds that they are arbitrary and capricious.

The dissent would go further and vacate the Commission's orders in their entirety.  The dissent reasons that we have no way to determine what the Commission would have done absent this unlawful action, and we cannot assume the agency would have started from scratch and issued the same remand order.  We agree that the record does not establish what the Commission would have done had it recognized this legal error. But while the dissent traces this defect to the remand order, we view it as limited to the rehearing order.  Recall that once the D.C. Circuit

Nos. 22-3176/3666/          *Electric Power Supply Ass'n, et al. v. FERC*          Page 14
3794/3796

returned the record to the Commission, the Commission regained the authority to revise its
original order at will.  *See id.*  The decision to remand the record to the Commission belonged to
the D.C. Circuit alone, and we cannot review our sister circuit's decision by recalling and
vacating the remand order.  *See* 28 U.S.C. §§ 41, 43, 46.  Because the record is silent on whether
the Commission could or would have granted PJM's request for a rehearing had it recognized
that Chairman Glick exceeded his authority, we must vacate that part of the rehearing order and
remand for further deliberation.  *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156,
167–69 (1962).

We vacate the Commission's rehearing order in part and remand for further proceedings
consistent with this opinion.

———————————

## DISSENT

———————————

CLAY, Circuit Judge, dissenting in part.  The majority finds the Federal Energy Regulatory Commission ("FERC") Chairman's action to be unlawful, and then nevertheless leaves in place the results of his unlawful actions.  Although I agree with the conclusion that the Chairman exceeded his statutory authority when he unilaterally requested a voluntary remand, the majority's limited vacatur allows FERC to leave legal errors unresolved.  Because the Chairman's abuse of power cannot be dismissed as harmless, and thus necessitates some significant remedial action on FERC's behalf, I would vacate the challenged 2021 orders in their entirety.  Accordingly, I respectfully dissent in part from the majority's opinion.

## I. BACKGROUND

Simplifying the technical background of this case, FERC made changes related to PJM Interconnection, LLC's reserve market design after PJM submitted certain proposed revisions (the "2020 orders").[1]  Following FERC's decision and a change in presidential administration, the composition of FERC began to significantly change, and the lone dissenter from the 2020 orders—FERC's recently promoted Chairman—apparently decided to take advantage of this turn of events.  Thus, while the 2020 orders were pending review in the D.C. Circuit, FERC's Chairman, Richard Glick, unilaterally directed the agency's Solicitor's Office to move for a voluntary remand, effectively providing the Chairman with a second chance to secure the different outcome he desired.  On remand, FERC reversed course from its 2020 orders,

———————————

[1]Specifically, FERC adopted revisions to PJM's market design that "raised the price cap for obtaining the minimum supply of reserves from $850/MWh to $2,000/MWh" and "reshaped the demand curve for additional reserves."  Pet'rs' Br., ECF No. 75-1, 11.  Because supply must exactly meet demand in the power grid, "reserve systems" are in place to meet peak levels of consumption.  PJM is a FERC-regulated regional transmission organization that oversees this balance, and therefore successfully proposed certain revisions to the market design.

reinstating the original market design in a new order and affirming its decision by denying rehearing (the "2021 orders").[2]

The majority correctly concludes that Chairman Glick's unilateral action exceeded his statutory authority. The Department of Energy Organization Act (the "DOE Act") delineates the Commission's and the Chairman's powers and responsibilities in 42 U.S.C. § 7171(c) and (e). First, § 7171(c), which details the "Duties and Responsibilities of Chairman" provides that:

> The Chairman shall be responsible on behalf of the Commission for the executive and administrative operation of the Commission, including functions of the Commission with respect to (1) the appointment and employment of hearing examiners in accordance with the provisions of title 5, (2) the selection, appointment, and fixing of the compensation of such personnel as he deems necessary, including an executive director, (3) the supervision of personnel employed by or assigned to the Commission, except that each member of the Commission may select and supervise personnel for his personal staff, (4) the distribution of business among personnel and among administrative units of the Commission, and (5) the procurement of services of experts and consultants. . . .

42 U.S.C. § 7171(c). Additionally, § 7171(e) provides that, "[t]he Chairman . . . shall preside at all sessions of the Commission and a quorum for the transaction of business shall consist of at least three members present. . . . Actions of the Commission shall be determined by a majority vote of the members present." *Id.* § 7171(e).

These sections clearly indicate that only a majority vote can empower the Chairman to take any official action. Further, the Chairman's expressly delineated duties are ministerial, rather than substantive. Indeed, "[c]ollective action is prerequisite to any alteration of a preexisting [FERC] order." *Pub. Serv. Comm'n of N.Y. v. Fed. Power Comm'n*, 543 F.2d 757, 776 (D.C. Cir. 1974). If Chairman Glick (or any Chairman, for that matter) could unilaterally reopen agency proceedings, such power would "wreak havoc on the stability of the agency's decision." *Id.* at 777. Based on this and the additional reasoning contained in the majority

---

[2]Specifically, after the Chairman's unlawful action securing voluntary remand, FERC reversed its 2020 orders in December 2021. A few months later, in July 2022, FERC denied rehearing of this 2021 order. Because FERC initiated the reversal process in 2021, these two agency actions are collectively referred to as the "2021 orders."

opinion, I come to the same conclusion as the majority regarding Chairman Glick's allotted power—he exceeded his statutory authority in seeking remand without a majority vote.

However, unlike the majority, I would find that this error necessitates full, rather than partial, vacatur of the improperly decided 2021 orders. The majority's contrary holding allows FERC the opportunity to claim that it would have come to the same conclusion regardless of the unlawful remand. Because FERC, in the unique circumstances of the instant case, cannot un-ring the bell or travel back in time to correct this serious error, vacating the product of its unlawful acts is the only way to honor the mandated, unambiguous decision-making process that Congress required by its passage of the DOE Act.

## II. ANALYSIS

### A. Partial Vacatur is Inappropriate in This Case

The majority acknowledges that "[t]he Commission considered the significance of the Chairman's ultra vires act when PJM raised it in its petition for rehearing." Maj. Op. at 13. But despite having the same statute and identical arguments before it, FERC reached the wrong conclusion, holding that the Chairman possessed the legal authority to unilaterally request remand. In addition, the majority correctly notes that FERC's interpretation deserved no deference and did not implicate *Chevron*, inasmuch as the statute is "not sufficiently ambiguous." *Id.* at 12 (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)). Because the statute at issue is unambiguous, the interpretation of 42 U.S.C. § 7171 does not implicate changed circumstances or new law, and the ordinary remand rule does not apply. *See, e.g.*, *Negusie v. Holder*, 555 U.S. 511, 523 (2009) (remanding because the agency had not yet exercised its discretion to interpret the statute in question); *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law."); *INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (remanding to the BIA an unconsidered claim related to the changed circumstances in Guatemala). Therefore, this Court need not remand to the agency for it to apply its expertise and make a decision in the first instance—FERC already had that opportunity. However, despite FERC's unquestionably erroneous interpretation,

*Electric Power Supply Ass'n, et al. v. FERC*            Page 18

the majority would extend to the agency an unwarranted opportunity to attempt a do-over by leaving the bulk of the 2021 orders in place.

Further, because FERC cannot reconsider and remedy some independent, severable issue from a procedurally correct larger opinion, this case does not present the usual circumstances warranting partial vacatur. *See, e.g.*, *Murillo Morocho v. Garland*, 80 F.4th 61, 63 (1st Cir. 2023) (vacating in part and remanding for further proceedings because the BIA applied the incorrect legal standard to one prong of petitioner's Convention Against Torture claim); *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 399 (D.C. Cir. 2019) (vacating the Commission's order in part and noting that the court could leave in place the portions of the order that "[were] not interconnected" to the offending parts of the rule and "analyzed [] independently"); *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) (noting that the evaluation of an agency order's severability for vacatur-in-part turns on whether "there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion [of the order] if the challenged portion were subtracted" and declining to merely vacate in part (citation omitted)); *Davis Cnty. Solid Waste Mgmt. v. U.S. EPA*, 108 F.3d 1454, 1460 (D.C. Cir. 1997) (vacating in part because the "severance of standards for small units and cement kilns 'will not impair the function of [the other standards] . . . and there [was no] indication that the regulation would not have been passed but for [the] inclusion' of the standards for small units and cement kilns." (brackets in original) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988))). Unlike the cases in which an isolated portion of the agency's decision was severable, the Chairman's illegal actions in the instant case affected both the procedure and the substance of the 2021 orders, permeating the entirety of the agency's analysis. As the majority concedes, this Court cannot separate the error that occurred from the substantive outcome of the 2021 orders, distinguishing this case from those cases that are sometimes vacated in part.

After agreeing that we cannot assume that FERC would have issued the same 2021 orders absent the recognized error, the majority nevertheless refrains from full vacatur to avoid "recalling and vacating [the D.C. Circuit's] remand order." Maj. Op. at 14. But we would not be "recalling" or "vacating" the D.C. Circuit's order. In fact, the D.C. Circuit's order granting FERC's voluntary remand request is not even before this Court. Contrary to the majority's

argument, this Court's job is certainly not to vacate the D.C. Circuit's order granting remand, but rather to appropriately fashion a remedy that addresses the agency's errors presented to *this* Court within *this* appeal.  *Cf. Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996) (en banc) (citing *Atchison, Topeka & Santa Fe Ry. v. Pena*, 44 F.3d 437, 443 (7th Cir. 1994) for the proposition that the Court's duty is to independently decide our own cases without constraint from our sister circuits).  The record has been placed back into FERC's hands by the D.C. Circuit, and vacating FERC's improperly decided 2021 orders would not change that outcome.  Instead, full vacatur properly demands agency accountability for FERC's flagrant error, requiring some additional analysis and action beyond merely considering "what, if anything, it could or would have done differently."  Maj. Op. at 13.

Nonetheless, the majority forgoes instituting a remedy that would adequately address the illegality of the Chairman's actions, instead opting to punt the unresolved question to the agency that, for whatever reason, failed to interpret the eminently clear statute correctly in the first place.  With the issues before it fully briefed, FERC previously had its opportunity to correct the error in this case but chose not to.  By explicitly opening the door to FERC's future inaction or legal error and leaving the tainted 2021 orders in place, the majority hands the agency yet *another* chance to avoid the elimination of the grave error that placed this case before this Court.

## B.  Harmless Error in the Administrative Law Context

To evaluate why FERC cannot simply leave the 2021 orders standing, a brief overview of harmless error is warranted.  *See Carlson*, 938 F.3d at 351 (explaining that the APA permits a reviewing court to set aside "part of an agency order" when:  (1) the agency would have adopted *the same disposition* regarding the remainder of the order *even if the unlawful portion were subtracted*, and (2) the remaining parts function sensibly without the stricken provision).  The harmless error doctrine may be employed in the administrative law context "when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached."  *Nat. Res. Def. Council v. U.S. Forest Serv*., 421 F.3d 797, 807 (9th Cir. 2005) (emphasis in original) (citation omitted); *see also United States v. Utesch*, 596 F.3d 302, 312 (6th Cir. 2010) ("[A] reviewing court must focus not merely on the ultimate rule but on the

process of an administrative rulemaking.").[3]  Various courts have evaluated harmless error in the administrative law context using slightly different standards, depending upon whether the error at issue is properly characterized as more procedural or substantive.  The harmless error inquiry for substantive errors usually focuses on whether the agency would have reached the same result absent an error,[4] while the inquiry for procedural errors usually evaluates whether an error prevented specific facts or arguments from being presented to an agency.[5]  Although the caselaw explaining the harmless error analysis' application to the administrative law context varies, Chairman Glick's error fails the test on all fronts.

Importantly, harmless error must be applied with caution in the administrative law context.  *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090 (9th Cir. 2011).  If the harmless error rule were to only take account of results, an agency could always claim that it would have adopted the same rule even if it had complied with the proper procedures.  *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1487 (9th Cir. 1992).  In other words, agency leaders could act before heeding administrative procedures, effectively asking for forgiveness rather than permission and leaning on the incumbent members to later agree that they surely would have adopted the same rule all along.  In this case, the failure to obtain a quorum was not some technical error, but "resulted in a decision-making process that was contrary to that mandated by Congress."  *Cal. Wilderness Coal.*, 631 F.3d at 1095.  Thus, to avoid gutting the procedural requirements carefully delineated in the DOE Act, the harmful error analysis in the administrative law context must focus on both the process and the result.

---

[3]*See also Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792, at *7 (6th Cir. Sept. 16, 1993) (focusing both on the procedure used and the substance of the decision reached in evaluation of harmless error); *Braniff Airways v. Civ. Aeronautics Bd.*, 379 F.2d 453, 466 (D.C. Cir. 1967) (same); *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964) (same); *U.S. Steel Corp. v. U.S. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (same); *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1224 n.13 (11th Cir. 2015) (same); *Del. Riverkeeper Network v. Sec.'y Pa. Dep't of Env't Prot.*, 833 F.3d 360, 377 (3d Cir. 2016) (same).

[4]*See, e.g.*, *Belcher v. Dir., OWCP*, 895 F.2d 244, 246 (6th Cir. 1989) (finding harmless error for the ALJ to apply the wrong regulation where the relevant regulation would have compelled the same result).

[5]*See, e.g.*, *Geber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002) (finding prejudicial error where the U.S. Fish & Wildlife Service failed to publish a map with its permit application, preventing a conservation group from making comments on the proposed permit application).

### C.  Application to Chairman Glick's Unilateral Action

The question in this case is whether the Chairman's unilateral action had any bearing on the procedure used or the substance of FERC's 2021 orders.  Because Chairman Glick's action certainly affected both procedure and substance, the majority's limited vacatur is improper. Importantly, as FERC considers the proper action to take on remand, leaving the 2021 orders standing through inaction is not a viable option.  In this case, the harmless error analysis can be viewed through two lenses:  absent the Chairman's unlawful action, (1) would the Commission have nonetheless voted to voluntarily remand had a quorum actually voted, and (2) would the Commission have nonetheless substantively decided the 2021 orders in the same way.  The answer to both of these questions is unclear, indicating that there are irreparable errors in both the process and the result.

Addressing these harmless error questions in chronological order, this Court cannot speculate as to how a quorum would have voted regarding a voluntary remand.  After all, despite his or her political or substantive inclinations, a commissioner may vote against voluntary remand because remands can involve years of additional proceedings, require high litigation costs, and disturb the stability of the policymaking process.  *See* Joshua Revesz, *Voluntary Remands: A Critical Reassessment*, 70 Admin. L. Rev. 361, 370–80 (2018) (exploring reasons an agency may desire or decline to voluntarily remand).  Furthermore, at the time Chairman Glick should have taken the vote, two out of five of the Commission members likely would not have moved for remand, based on their prior votes in the 2020 orders.[6]  Thus, if only three members are required to constitute a quorum, one could not readily conclude that Chairman Glick would have been able to secure the requisite votes.[7]  This procedural error was far from harmless, as it

---

[6]Commissioner Danly and Commissioner Chatterjee, both of whom were in the majority for the 2020 orders, remained on the Commission at the time Chairman Glick unilaterally remanded the case.  Therefore, it is likely that they would not agree to a voluntary remand to reconsider their own decision.

[7]For these same reasons, any ratification argument also fails.  Although a principal may validly sanction the prior action of its purported agent, the party ratifying must "be able not merely to do the act ratified at the time the act was done, but also *at the time the ratification was made.*" *Fed. Election Comm'n v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) (emphasis in original) (citing *Cook v. Tullis*, 85 U.S. 332, 338 (1873)); *see also* Restatement (Second) of Agency § 90 cmt. a (1958) ("The bringing of an action, or of an appeal, by a purported agent cannot be ratified after the cause of action or right to appeal has been terminated by lapse of time.").  By the time the Commission "ratified" Chairman Glick's unlawful voluntary remand by voting on the 2021 orders, the D.C. Circuit

Nos. 22-3176/3666/          *Electric Power Supply Ass'n, et al. v. FERC*          Page 22
3794/3796

prevented Petitioners from challenging the voluntary remand, likely influenced the content of the voluntary remand request itself, and led to a further substantive error.

Turning to an explanation of the substantive error resulting from FERC's unlawful review, it is also unclear whether FERC would have overturned the 2020 orders using the only other standard applicable to evaluating a final agency order. Specifically, there are only two ways by which an agency can reconsider a final order.[8]  The first option is employing the unique voluntary remand mechanism, as courts frequently grant voluntary remands to preserve judicial resources. *See, e.g.*, *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) ("We commonly grant such [voluntary remand] motions, preferring to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources. . . ."). By invoking the benefits of a voluntary remand, the agency can consider its original decision with fresh eyes—in other words, FERC can begin with a blank slate and completely rework the merits of its 2020 orders by reassessing PJM's initial proposals.

However, without a *valid* voluntary remand (as in this case), agencies must employ Section 206 of the Federal Power Act to challenge a final order. 16 U.S.C. § 824e. Under Section 206, FERC would bear the burden of showing that the document on file at the time, the 2020 order, was unjust and unreasonable. *See Emera Me. v. FERC*, 854 F.3d 9, 26 (D.C. Cir. 2017) (noting that a Section 206 proceeding requires FERC to bear the burden of making an explicit finding that the existing rate was *unlawful* before it was authorized to set a new *lawful* rate). In order to enhance decision-making stability and to prevent agencies from locking their decisions in a perennial revolving door, the Section 206 burden is a stringent one. Therefore, the 2021 orders cannot be left in place, as FERC's current members cannot speculate as to the

---

could have ruled upon the arbitrariness of the 2020 orders, making the 2020 orders final and thus requiring FERC to employ Section 206. Alternatively, the D.C. Circuit could have declined to grant the voluntary remand motion later in the timeline of the proceedings. *See, e.g.*, *Miss. River Transmission Corp. v. FERC*, 969 F.2d 1215, 1217 n.2 (D.C. Cir. 1992) (denying a voluntary remand motion made a few days before oral argument). Once again, we may never know.

[8]The 2020 orders in this case are final because once the record was filed in a court of appeals, the Commission lost its power to correct or change the orders, as jurisdiction had passed to the court. *See* 16 U.S.C.§ 825*l*(a); *see also Hirschey v. FERC*, 701 F.2d 215, 217–18 (D.C. Cir. 1983).

*Electric Power Supply Ass'n, et al. v. FERC*

manner in which the then-members would have ruled had the higher Section 206 standard been employed.

Not only would a higher standard potentially change the ultimate outcome, but, at the very least, the content of the opinion would be extremely different, as a finding that the 2020 order was unjust and unreasonable would necessitate further analysis. *See, e.g.*, *Int'l Transmission Co. v. FERC*, 988 F.3d 471, 485–86 (D.C. Cir. 2021) (recognizing petitioner's argument that "even if FERC had paid lip service to Section 206's requirements, its analysis could not support its finding that the existing [rates] were unjust or unreasonable." (internal quotations omitted)); *Emera*, 854 F.3d at 27 (explaining that FERC must undertake additional analysis to satisfy the dual burden of Section 206). To put this standard into a different, more accessible context, suppose that the price of coffee became regulated. Coffee consumers may believe that a reasonable price for coffee ranges anywhere from $1.00 to $10.00 per cup. *See Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 471 (D.C. Cir. 2008) (explaining that "there is not a single just and reasonable rate," but rather a "zone of rates that are just and reasonable."). In this coffee hypothetical, suppose a coffee company proposed a price cap somewhere in this range. Clearly, a finding that the proposed price cap is just and reasonable is not equivalent to a finding that the proposed price cap is *un*just and *un*reasonable—the latter finding involves significantly more analysis, as the former may be proved by merely recognizing that the proposal falls within the reasonable zone of $1.00 to $10.00. While divining what exactly FERC would have held under a Section 206 standard may be a fruitless task, it is certainly extremely likely that the substance of the opinion would change.

Further, FERC *agrees* that a different, more lenient standard applied due to the unlawful remand. Instead of explaining why Petitioners are not prejudiced by this different standard, FERC tellingly argues that Petitioners forfeited this argument. This argument is not convincing, as Petitioners' rehearing application does explain that Chairman Glick exceeded his lawful authority in requesting the remand. Furthermore, FERC seems to misunderstand Petitioners' argument regarding prejudice, as each of its subsequent arguments rely on the premise that Petitioners are arguing that the voluntary remand process is unlawful altogether. Not so— Petitioners solely argue that *this* unilateral remand in particular circumvents Section 206's

Nos. 22-3176/3666/          *Electric Power Supply Ass'n, et al. v. FERC*          Page 24
3794/3796

standards. Had Chairman Glick properly convened a quorum that had voted to voluntarily remand, there would be no argument that a different standard should apply.

While contradictorily stating that the legal mistake in this case is inseverable from the underlying 2021 orders, the majority nonetheless incorrectly concludes that a limited vacatur would redress these errors. Maj. Op. at 13–14. As explained above, the voluntary remand is a powerful tool that had an immense impact on the 2021 orders, as the lower burden applied on remand effectively circumvented the requirements of Section 206. Concisely, without the unlawful remand, we have no idea what FERC's conclusion would have been. *Accord* Maj. Op. at 13 ("We agree that the record does not establish what the Commission would have done had it recognized [its] legal error."). Our job is to evaluate the question of whether the unlawful unilateral remand had any "bearing on the procedure used or the substance of the decision reached." *Nat. Res. Def. Council*, 421 F.3d at 807. In this case, the answer is unequivocally yes, and the unlawful byproducts of the Chairman's actions must be vacated in full. The errors that FERC made in promulgating the 2021 orders infected the substance of the orders, requiring their complete invalidation.

The majority sanctions a mere slap on the wrist, stating that upon remand, FERC can determine "what, if anything, it could [] have done differently." Maj. Op. at 2, 13. However, Chairman Glick should not be able to reap the benefits of a less stringent standard of review resulting from his improper action, and this Court should not issue a decision that allows agency leaders to "ask for forgiveness rather than permission," armed with the understanding that real consequences will not result from their actions. Effectively, Chairman Glick's actions allowed the agency not only to avoid litigating the case on the merits in the D.C. Circuit, but also to circumvent the more demanding standard that would apply to a challenge of a final agency opinion. Such action cannot be harmless, and this Court should not provide FERC with a loophole to avoid addressing a very substantial error. For these reasons, FERC should not be permitted to sit back and do nothing upon remand.

### III. CONCLUSION

Unlike the majority, I would vacate the 2021 orders because Chairman Glick's unilateral remand clearly "had [a significant] bearing on the procedure used or the substance of the decision reached," and the resulting error is inseverable from the orders. *Nat. Res. Def. Council*, 421 F.3d at 807; *see also Douglas Timber Operators, Inc. v. Salazar*, 774 F. Supp. 2d 245, 260 (D.C. Cir. 2011) (holding that the "Secretary lacked inherent authority" and holding that such error "constitute[d] a procedural error of sufficient gravity for the court of appeals to have opted for vacatur"); *Cal. Wilderness Coal.*, 631 F.3d at 1095 (rejecting partial vacatur where "it [was] almost impossible to determine the precise impact of [the procedural error]"). We will never know if the then-current Commission would have voted to voluntarily remand the agency record from the D.C. Circuit. Likewise, we will never know if the D.C. Circuit would have granted remand had the request been made later in the proceedings. Finally, the procedural error in the way the voluntary remand was requested could have led to significant substantive errors, as the outcome from applying Section 206 could vastly differ from the current 2021 orders. For these reasons, there is substantial doubt that FERC would have evaluated the remainder of the orders in the same manner or reached the same disposition, and partial vacatur is, therefore, inappropriate. *Carlson*, 938 F.3d at 351. However, to correct the Chairman's unlawful action, we *can* ascertain how FERC would rule on the 2020 orders under Section 206—the only other way for the agency to challenge an order that had been turned over to the courts.

Judicial review is intended to provide a *meaningful* forum for reviewing agency actions to correct error, yet the majority shies away from providing any meaningful relief. We should not leave in place a rule that the agency never properly promulgated. In order to minimize the error of Chairman Glick's solo endeavors in this unique situation, I would vacate the challenged 2021 orders and remand for further proceedings consistent with this opinion. Upon remand, FERC would, of course, have the option to challenge the 2020 orders in a manner that accords with Section 206. Rather than forcing interested parties to comply with orders that this Court has found to be erroneous, I would require that FERC take accountability for its past mistakes. I therefore respectfully dissent in part.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 22-3176/3666/3794/3796

ELECTRIC POWER SUPPLY ASSOCIATION (22-3176/3666); PJM POWER PROVIDERS GROUP (22-3794/3796),

    Petitioners,

PJM INTERCONNECTION, L.L.C.,

    Intervenor-Petitioner (22-3794/3796),

    v.

FEDERAL ENERGY REGULATORY COMMISSION,

    Respondent,

AMERICAN MUNICIPAL POWER, INC., OLD DOMINION ELECTRIC COOPERATIVE, PJM INDUSTRIAL CUSTOMER COALITION, PENNSYLVANIA PUBLIC UTILITY COMMISSION, MONITORING ANALYTICS LLC, and PJM INTERCONNECTION, L.L.C. (22-3176/3666); MARYLAND OFFICE OF PEOPLE'S COUNSEL, DELAWARE DIVISION OF THE PUBLIC ADVOCATE, and NEW JERSEY DIVISION OF RATE COUNSEL (22-3176/3666/3794/3796),

    Intervenors.

> **FILED**
> Dec 21, 2023
> KELLY L. STEPHENS, Clerk

Before:  SUTTON, Chief Judge; CLAY and LARSEN, Circuit Judges.

## JUDGMENT

    THESE CONSOLIDATED APPEALS, comprising four petitions for review filed by Electric Power Supply Association and PJM Power Providers Group of orders of the Federal Energy Regulatory Commission were transferred to this court by the United States Court of Appeals for the District of Columbia Circuit.

    UPON FULL REVIEW of the record and the briefs and arguments of counsel,

    IT IS ORDERED that the petitions for review are GRANTED IN PART.  The Commission's rehearing order is VACATED IN PART and REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

*Kelly L. Stephens*

_____

Kelly L. Stephens, Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on January 22, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Jared B. Fish*
Jared B. Fish
Attorney